The first case is CrimeSource Building Products, et al., v. United States, in Mid-Continent Steel and Wire, 2022-21-28. Mr. Sinko, is it? Yes, Your Honor. Are you open to take seven minutes? Yes, Your Honor. Well, you're going to take ten minutes, but... Yes, Your Honor. Save three for rebuttal. Please proceed. Thank you. Good morning, Your Honors. Brian Sinko on behalf of Plaintiff Appellant CrimeSource. CrimeSource is an importer of steel nails from Taiwan. The anti-dumping duties on our clients' imports from Liang, Chunyang, or LC for short, increased from 2.54 percent on one day to over 78 percent the next day, merely because these two days fell within two different periods of review. In the fourth review relevant to this appeal, Commerce selected three mandatory respondents, but did not calculate a dumping margin for any of those respondents. Commerce applied the penalty AFA rate assigned to the mandatory respondents to LC, even though Commerce had just calculated it a rate of 2.5 percent in the preceding review. And in the current review, LC informed Commerce that it was willing and able to respond to Commerce's anti-dumping duty questionnaire. Okay, that was after the deadline, right? If I understand the record correctly, the deadline for volunteering to be a voluntary respondent was December 4, 2019. Is that correct? Correct. It was after the deadline, Your Honor. But it did put itself forward, and it put itself forward immediately when it was aware that there were no mandatory respondents participating. Three days after, as soon as that final respondent dropped out, three days after it came forward and said, we're here, we're willing to cooperate, and our dumping margin is likely much lower than this AFA rate based on the preceding rate calculated in the last review. When did your client first become aware that the AFA rate would be pulled from the first review and it would be 78 percent?  Yeah, apologies. So it first became aware, so there were three respondents selected. The first respondent didn't, Bonatz didn't. I understand that. But when did you become aware? When did Midwest first suggest the 78 percent rate? The 78 percent had been applied in prior reviews, so you could presume that it would be applied in the fourth review when the mandatory respondents didn't cooperate, but when they actually knew for sure it was the preliminary results. In the first and second reviews, that AFA rate had been applied to some of the same respondents as in the fourth review, right? Correct, yes. And the AFA rate was based on, which is critical, was based on actually information from the investigation. It didn't contain any contemporaneous data from this period of review. There wasn't any contemporaneous data, right? No, Your Honor, and that's actually sort of the key to the case. So the statute provides that Commerce has to use, may use any reasonable method when you have, when all the margins are calculated based on AFA. And that puts a burden on Commerce to select a method that's appropriate for the circumstances. I don't understand you below or here to be complaining about the AFA rate itself, right? No. Okay. No, not the calculation of the AFA rate. Our claim is that the AFA rate did not reasonably reflect the potential dumping margin of LC, and that is Commerce's burden when it's calculating a non-selected respondent's rate. Right. Correct. Well, I hear you. Now, I have one other question, which is you mentioned that LC offered to provide information on the questionnaire, but they never actually did, right? I mean, they just said we will. Correct. But they never provided that. Correct. I mean, sometimes when parties say, oh, we're going to file an extra reply brief or something, or a surreply, they'll actually attach it. Correct, Your Honor. But in Chang-Shuhad, that case, it's the second Chang-Shuhad case. It actually showed that it discussed, and this court discussed how when a respondent puts itself forward, that can serve as evidence that its dumping margin is likely lower than what the court said. What does put itself forward mean? Saying I'm here, I'm willing to cooperate. But if you knew that earlier, if you knew that the 78% rate was likely at the time when the time limit for submitting a voluntary response existed, why weren't you required at that point to say, okay, let's be a voluntary respondent because we think the 78% rate is unreasonable? At the time that the deadline to be a voluntary respondent, it didn't know that it wasn't going to get the AFA rate. Apologies if I misstated. It didn't know that it wouldn't get the AFA. I thought you were saying that you could anticipate the AFA rate would be 78%. It could anticipate that the AFA rate would be 78%, but it couldn't anticipate that the third respondent was going to drop out. As soon as the third respondent dropped out, which meant that there weren't any mandatory respondents signifying that it likely would get the AFA rate, that's where three days later it came in and said, we are voluntary, we're willing to cooperate. And the reason it didn't attach information is a lot of times, and it's actually the general trend, commerce doesn't accept voluntary respondents. It has to be commerce has the discretion whether to accept or not. So in most cases, a company will say, it's a very costly endeavor to submit all this information. So the company will say, we're here, we're willing, please tell us whether you will accept it or not. And commerce didn't. And it had plenty of time to do so, as the preliminary results were still two months away, and the final results were still months away after that. Okay. I don't know whether this falls into your bailiwick or that of your co-counsel, but my understanding is that another argument that is being made here is that under these circumstances, it was unreasonable to apply the 78% rate from the first review to the all others rate here, without some contemporaneous evidence that that was a reasonable rate to use for the all others rate. And your argument, as I understand it, is there's no contemporaneous evidence to support that, and indeed the rates for the individual examined parties in the earlier reviews was much lower, right? Exactly, Your Honor. So because the mandatory respondents were AFA, the first point is it wasn't even necessary. It wasn't the expected method. The expected method is the weight average. Here they didn't have volume data. They didn't have any data for the mandatory respondents. So we're already in the prong of was it any other reasonable method. And here, given that there wasn't any data on the mandatory respondents, Thomas relied on a presumption, the presumption that the mandatory respondents are presumed to be representative of all exporters. A presumption isn't evidence. Here the only evidence on the record pertained to ELSI, which said Well, I think you'd have a difficult problem if it was an AFA rate that had been calculated contemporaneously at the time of the fourth review. But pulling it forward from the first review resulted in an all-others rate of 78%, whereas contemporaneously in the first review, the all-others rate was about half that, right? Correct. Exactly, Your Honor. It was even less. It was 2.16 was the original all-others rate calculated in the investigation. So the AFA rate was applied in the first review, but it actually comes from data that the petitioner put on the record in the investigation. I see I'm running out of time, getting into rebuttal. Can I finish answering Your Honor's question? We will finish the question and answer it. So you have record from the third review, that was 2.54% for ELSI. Then you have current review ELSIs were willing to cooperate. Commerce simply said the mandatory respondents are presumed to be representative, which is not substantial evidence to show that it reasonably reflected ELSI's rate when you're relying on data all the way back from the investigation compared to data from the third review and fourth review. Didn't Commerce actually look at prior rates that were applied in prior review periods to try to discern whether there were any trends that would show that the AFA rate would be not commercially realistic? Yes. It's not like they just applied, you said they just applied the presumption, but I read their opinion is doing much more than that actually.  but those rates don't pertain to ELSI. And that's why our appeal is focused on ELSI. Those rates pertain to other mandatory respondents. And to your point, they said that there was a trend of non-cooperation. We discussed this in our brief on page 39 of our opening brief, how in actuality they've calculated rates for the mandatory respondents in more instances. And the other point Commerce made was they said that there's a trend of increasing rates. Well, the trend of increasing rates is kind of a trick in numbers. You have a 6.16 to 27.69 for UNICATCH. Again, UNICATCH, not ELSI. And that, they said, was a significant increase. But even a 20.769 compared to a 78%, that's a huge increase. Again, especially when ELSI, who before had 2.16. In the third review, it was selected as a mandatory. What is your view of the Court of International Trade's emphasis on who has the burden here? Sure. So the burden in question gets to what evidence is on the record. And we would argue the burden is on Commerce to show that its rate reasonably reflected the dumping margin of ELSI. And that comes from the statute's reasonability requirement that it has to select a reasonable method. And also, again, this wasn't even the expected method, Your Honor. So no parties really disagreed. Since they weren't taking a weighted average, we're under the third tier, any reasonable method. And under the SAA, the SAA provides that any reasonable method you have to, it has to reflect the potential dumping margin. And no party really disagrees on that point. Counsel, you use all the time. Yes. Okay, which indicates, shows the sometimes unwisdom of splitting time. Yeah. We'll give you one minute rebuttal. We'll hear from Ms. Slater. Thank you. Thank you, Your Honor. Good morning. My name is Kelly Slater. I'm with Appleton Love Law Firm. And I appear today on a soggy day on behalf of the Taiwanese plaintiff appellants. Now, I was wondering if the court would like me to list all the names for the record. No need. Okay, just wanted to make sure. I'd like to thank the court for the opportunity to appear today. I'm here on behalf of a handful of companies who are cooperative, separate-rate respondents in the underlying commerce proceeding involving steel mills. Your argument is that using the 78% AFA rate as the all-others rate is unreasonable under these circumstances, correct? Yes. Yes, Your Honor. And it's unreasonable because what? It's inconsistent with the all-others rate that was applied in the earlier proceeding and inconsistent with the individual examiner rates? That is correct, Your Honor. We also are taking the position that based on the spirit of the law in the Tariff Act of 1930 with respect to separate-rate respondents, the statute encourages cooperation. Spirits don't count so much when you've got legislation, statutes, and procedures. Well, true, but the statute does encourage cooperation through the calculation of actual rates based on actual data. Okay, but I think what commerce is saying is that, first of all, we can ignore the individually examined rates. That may be questionable, but let's put that aside for a moment. They're saying you had the opportunity to submit data for the record that would show that using the 78% rate as the all-others rate was unreasonable and you didn't submit such data, you only relied on the individual examined rates from prior proceedings. What's the answer to that? I'm not sure I understand the question. I think what commerce is saying is if you wanted to show that using the 78% rate as the all-others rate was unreasonable, you should have submitted data in the record that supports that position and that you didn't do that, other than pointing to the calculated rates for other parties in past review periods. So what's the answer to that? They say you should have put in more information. I don't know what the deadline for that was. I guess it was 30 days before the preliminary review, right? Normally, to qualify for voluntary respondent status. Well, we're not necessarily talking about that. That would be one thing that could be done, would be to volunteer for voluntary respondent status. But as I understand what commerce is saying, they're saying you could have also put in other data to show that this 78% rate shouldn't be applied as the all-others rate. Right? Well, I'm not quite sure what that data would be, Your Honor. Because we did argue on behalf of Taiwan respondents that the actual calculated rates in prior reviews could serve as a valid, factual, substantial evidence-based standard for applying the all-others rate in the 2018-2019 review. That data is a matter of public record, and I believe we indeed did argue at the commerce level that that would be a more appropriate means for treating the cooperative Taiwan respondents in the 2018-2019 review. Is it appropriate for an appellate court to look at what is the more appropriate way to determine the expected rate? I'm just having a hard time with the way you're arguing this in the sense that we're reviewing this for substantial evidence, and it's not what is the best way to do it or what is a more appropriate way to do it. It's is there substantial evidence to support the way commerce did it, right? And is the way commerce did it appropriate under the statute? So what is your legal argument or your substantial evidence argument for why commerce didn't get a rate here? I'm running out of time. Well, you have time to answer the question. Okay, thank you. My legal argument is that the individually examined rates throughout the proceeding were far lower than the 78 percent rate. That's basically the argument you're making, isn't it? I'm sorry, I didn't hear you. Basically, the argument you're making is that the individually examined rates throughout the proceeding were substantially lower than the 78 percent rate, making it unreasonable to apply the 78 percent rate as the all others rate. Correct, correct. And that's basically the sum and substance of it, right? Correct. And also the language of 19 U.S. Code 1673 D.C. 5A mandates the exclusion of zero, de minimis, and tax-available margins in calculating the all others rate. But that's not what commerce did here. They applied a punitive adverse tax-available rate to the all others separate rate respondents. What about the exception, though? Pardon me? What about the exception under Part B? Okay, so Part B talks about any reasonable method to establish an estimated all others rate. And it says including averaging the estimated weighted average dumping margins. I mean, it includes looking at AFA, right? AFA is a punitive rate that is applied to non-cooperative respondents under the statute. All right. I was reading Part B of the statute as saying they are allowed to look at the minimis margins and AFA as part of the average. Under Part A, no. But under Part B, yes. Under Part B, any reasonable method. And we contend that it's not reasonable to apply punitive rates normally applied to non-cooperative respondents to cooperative respondents. Okay. Thank you, counsel. Let's hear from the government again. Okay, thank you. May it please the Court? This Court should affirm because the trial court correctly sustained Connors' calculation of the all others rate in which Connors adhered to the expected method. Let me tell you what my problem is here. Under the statute, it is true that you could pull the all others rate forward from the first review, the 78 percent rate. And perhaps the party should have anticipated that that was a possibility. But the difficulty that I have is that at the same time you're pulling it forward that rate, you don't do anything with the all others rate that was calculated for the same period of review, which was 35 percent. And it seems to me that there's a real question as to whether it's reasonable to pull forward the 78 percent rate but not pull forward the all others rate that was used contemporaneously in that earlier proceeding. And it may be that it would be reasonable to use a 78 percent all AFA rate for the all others rate if there had been some contemporaneous evidence in the fourth review that that was reasonable. But there's no contemporaneous evidence that that was a reasonable rate to apply to the all others rate. So you're using past data for the AFA rate but not past data for the all others rate, which was calculated at the same time. Why is that reasonable? That's my question. Well, a few answers to that. The first is that this court did state in Albemarle specifically that it's disfavored for Connors to generally pull forward rates. But it's also specifically stated that Connors can pull forward an AFA rate. So that's absolutely true. And nobody is questioning that they could pull forward the AFA rate from the first proceeding. But what's problematic is that you're applying that rate to as an all others rate, whereas in the past, the all others rate was only 35 percent. And there's no contemporaneous evidence that the 78 percent was a reasonable rate to apply to the all others rate. That's the difficulty I see. Well, I think what's important here in that case is that, you know, not only can you pull forward an AFA rate as the AFA rate, then what happens is that SAA, as Judge Skoll pointed out, specifically countenances the use of the AFA rate in putting together the all others rate, assuming that there is no non-zero calculated rate on the record. So the expected method... I don't think you're responding to my question, which is that may in general be appropriate. In general, the AFA rate is a contemporaneously calculated rate. Here it's not. You're reaching back to the first review and saying, okay, we're going to use 78 percent as the AFA rate. No problem with that. But what's the basis for then using that AFA rate for the all others rate when the all others rate in the past was half that? The basis for using that rate as the all others rate is that all the mandatory respondents on this contemporaneous review got that 78 percent AFA rate, which is not in question. And then the SAA says that the expected method in that case is to weight average all the mandatory respondents' rates, whether those are AFA... You're just not responding to my question, which is it may be that it's common and reasonable to apply the AFA rate as the all others rate. But I'm saying this is a unique, or not perhaps unique, but a situation in which you're pulling forward that rate from the earlier proceeding, but not pulling forward the all others rate, which was also calculated in the earlier proceeding. That seems to be inconsistent. What's the justification for doing that under the circumstance? Because there was no cause for Commerce to pull forward that 35 percent all others rate from the first period of review. That rate was calculated using an average of the de minimis and AFA rates in the first review, and it resulted in a 35 percent rate. That was in accordance with the expected method, what Congress foresaw and presumed would happen. Here, Commerce also used the expected method. The only way that Commerce would potentially look and pull forward a rate is if it determined that use of the expected method was not warranted. Here, it looked at the history of rates on the proceeding, which this court did countenance in the Boson case from a couple years ago, and it found that there was a history of non-cooperation, history of AFA rates in the proceeding. But all the individually calculated rates from all these periods are far lower than the 78 percent rate. The individually calculated rates are lower, and they range from I think around 2 percent to 28 percent. But again, the all others rate is supposed to be calculated according to the expected method unless there is substantial evidence that shows that the expected method would not be reasonably reflected. And Commerce found reasonably in this case that that's not the case. They found that looking at the history of rates on the proceeding, you can't just look at the calculated rates. You have to include the AFA rates in your calculation of this because the mandatory respondents are presumed to be representative. And if there is a history of non-cooperation by the mandatory respondents in this review, then as the trial court correctly held, you can't simply ignore that and only cherry-pick the data that favors their argument. Well, that's not, it seems to me, what the issue is. The issue is you use, you pluck the rate from the earlier proceeding as the AFA rate at 78 percent, but you don't pull forward the all others rate from that very same earlier proceeding, which is half of the 78 percent. Well, again, Commerce's practice is not to pull forward rates as a general practice. And I think this court- But why if it pulls forward one rate, shouldn't it pull forward the other rate? Well, for one, Albemarle does have the specific exception for pulling forward AFA rates and specifically disfavors generally pulling forward rates. But also, the AFA rate, it's not just pulling it forward. It pulled it forward for the mandatory respondents. For the all others rate, what it did was use that AFA rate that was assigned to the mandatory respondents and use the expected method by weight averaging those rates to come up with the all others rate. So it didn't simply take the AFA rate from the petition that was corroborated in the first review and pull it forward and say, hey, that's the all others rate. It assigned that 78 percent rate to two different non-cooperating respondents, and there's no question that they didn't cooperate, and then said that Congress expects us to weight average the de minimis, zero, and AFA rates, and that's what they did here. There just weren't any zero and de minimis rates on the record. And then what they did was use that expected method, looked at the party's arguments that the history of rates on the proceeding shows that the AFA rate, the 78 percent rate wouldn't be reflective, and disagreed, and the trial court correctly agreed with that. I'd just like to hit one more point before I turn it over to Mr. Gordon, and that's Mr. Cinco's new argument that Congress did not, in fact, use the expected method. Times Square specifically said in its brief at page 36, for example, that Congress used the expected method, and now it's saying that Congress didn't actually use it, and therefore we're under the any other reasonable method rubric. That's simply not true, and it's not consistent with what they said, and the court should not count that as an argument made for the first time, I think, in its reply. Okay, so what's the evidence that Congress relied on in using the 78 percent rate from the earlier proceeding and applying it as the all others rate here? What evidence supported that? You keep talking about, well, that was permitted under the statute. The statute, of course, doesn't contemplate that exact situation, that it's pulling for the rate and applying it as the all others rate in the current proceeding. What's the justification for using that rate and not looking at any contemporaneous data for the all others response? Well, Congress justification, its justifications were multiple. First, it adhered to what Congress expected. Second, it used that rate as the AFA rate and looked at the history of rates on the proceeding, and this court stated in the Boson case, and the trial court also countenance, that looking at the history of rates on the proceeding is a valid way to determine whether a rate is reasonably reflected. But all the rates in the proceeding were all hugely lower than the 78 percent rate. They weren't, though. Only the calculated rates were lower, but Prime Source and Cheng Chu want to cherry pick and ignore the AFA rates on the proceeding, but Congress specifically- Are you saying that we're justified in using the 78 percent rate because we used the 78 percent rate in the past? That doesn't seem to be logical. Well, and also as, you know, first it was expected and there were a history of AFA rates on the proceeding, and finally, I think as your Honor pointed out regarding LC, LC and any other non-selected respondent had the opportunity to put information on the record of this contemporaneous review to show that they didn't think that the mandatory respondent's rates or that the AFA rate would be representative. They had this opportunity to do so. It's the respondent's burden to build the record, and so to the extent that there isn't contemporaneous data on this review, other than the all others rate and other than the history of rates on the proceeding, that's something that the non-examined respondents could have done something about in a timely manner and chose not to do. I'll cede the rest of my time to Mr. Gordon. Thank you. Thank you. Mr. Gordon. Good morning, Your Honors. Adam Gordon with the Bristol Group on behalf of Incontinent Steel and Wire. I'd like to pick up where Ms. Bay left off. In response to your question, Judge Dyke, what was the basis for using the 78 percent rate in here? The basis is on the record of this actual review. You had one respondent, Bonutz, who never responded at all. You had another respondent, P.T., who said we're not going to participate. So there you have complete justification because you have complete failure to cooperate in response to Commerce's selection of these companies as mandatory respondents. That justifies unquestionably the use of the adverse facts available rate. Nobody's contesting that here. I know, but this is an important point because the source of that rate isn't just the first review. The 78 percent rate is the petition rate. That was the rate alleged in the petition that was corroborated during the investigation, re-corroborated in the first review. Okay. And at the time in the initial proceeding, the all-others rate was 2 percent. In a market economy investigation and in market economy proceedings, the all-others rate is recalculated in every segment, every review. And so Commerce wasn't pulling the 78 percent rate from the first review. It was basing that 78 percent on the statutorily authorized source of adverse facts available, which was the petition rate. So it's very important to keep that in mind. Now, that actually, I think, that actually sheds light on your comment about why didn't they pull the low all-others rate from the first review. They're not pulling the AF rate from the first review. It was corroborated there, but that actually, the source of that is the petition, not the first review. And to your point about why didn't they pull the all-others rate is 2 percent. But that's not the point of this rate. This is an adverse facts available rate, not punitive, as counsel would ‑‑ it's a big number, but it's not punitive as a matter of law. It's intended to induce future cooperation. And I think it's very relevant to note that in the course of this proceeding, the record is littered with non-cooperative respondents, probably more than I've ever seen in my career. And there's a legally authorized, a legally sanctioned idea that a respondent who knows the consequences of not cooperating would cooperate unless not cooperating is in their interest. Why, for example, would PT say we're not going to cooperate in this review if they knew they're going to get the 78 percent rate, which is something that all the respondents have known. They have experience, counsel. They've been around the block. They can inform their clients of what's going to happen. It's well known because that rate has been used multiple times. If I may, I'd like to shift gear and pick up on another point Ms. Bay picked up on, which is counsel's argument that commerce isn't using the expected method here. And they're not using it, they say, because they didn't have any information on the record to conduct a weighted average of the margins. It doesn't matter. That's a red herring. All the companies lawfully receive the 78 percent rate. It doesn't matter what the volume of their inputs would have been. No matter how you weight average it or simple average it, the number is the same. So that's nothing more than a canard and should be disregarded as a basis for questioning what commerce did. In the end, commerce followed the law. If they had done anything different, I submit, they would have been in violation of the law. There's no question about assigning AFA to the two respondents who either didn't show up or said they wouldn't play ball. LC showed up late to the party after realizing that it was at risk, but then it never did what it should and never put information on the record to either support its potential request as a voluntary respondent or to demonstrate that its own experience was different. Every review stands on its own record. The fact that from day one to day two things changed, that's the nature of these proceedings, and all the companies know this. So in the end, what commerce did was follow the law. This is a very straightforward case, in my opinion. You had two AFA rates, and as the statute requires and as the SAA requires, they averaged those margins. If they'd done anything different, it would have been unlawful. And as we'll see, I think, in the companion case, they, again, followed the expected method. In that case, it involved a de minimis, a zero rate, and so you got a very different outcome. But that was still following the law. Thank you, counsel. Thank you, Your Honor. Mr. Schleifer, we'll give you two minutes. Thank you, Your Honor. Addressing Your Honor's question about what is substantial evidence, substantial evidence means that what could a reasonable mind find? And here, it's simply no reasonable mind could find that on one day in the third review, you have a 2.5% rate for ELSI. For the next day, it went to 78%, which is a 3,000% increase. And it's simply not reasonable to assume that there was such an increase when there was no contemporaneous data on the record, reflecting that rate reasonably correlated with ELSI's potential dumping margin. In fact, the only real record or real contemporaneous data that Commerce is saying is a presumption that the mandatory respondents are presumed to be representative. But that's actually flawed and easily rebutted because one of the mandatory respondents that was selected, based on its volume of shipments, actually came in and said, we didn't have shipments, and Commerce agreed. So you can't even assume that this presumption, which isn't evidence, stands. And where the only evidence is a 2.54% to 78%, that's simply not reasonable. And unless your honors have any questions. Thank you, counsel. We'll take the case on the submission.